# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *In re Marriage of Levinson*, 2012 IL App (1st) 112567

---

| | |
|---|---|
| Appellate Court Caption | *In re* MARRIAGE OF ROBIN MITCHELL LEVINSON, Petitioner-Appellee, and ROBERT LEVINSON, Respondent-Appellant. |
| District & No. | First District, Fourth Division<br>Docket No. 1-11-2567 |
| Rule 23 Order filed<br>Rule 23 Order withdrawn<br>Opinion filed | June 7, 2012<br><br>July 5, 2012<br>July 12, 2012 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Award of temporary exclusive possession of the marital residence to petitioner for the duration of the dissolution proceedings pursuant to section 701 of the Illinois Marriage and Dissolution of Marriage Act was reversed where there was no jeopardy to the physical or mental well-being of petitioner or the children due to the "birdnesting" visitation schedule. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-D-4934; the Hon. Kathleen Kennedy, Judge, presiding. |
| Judgment | Reversed. |

Counsel on
Appeal

Brian J. Hurst and Olga A. Wrobel, both of Law Offices of Brian J. Hurst, of Chicago, for appellant.

Michael G. DiDomenico, Alan J. Toback, and Amanda M. Sleezer, all of Lake Toback, of Chicago, for appellee.

Panel

JUSTICE FITZGERALD SMITH delivered the judgment of the court, with opinion.

Presiding Justice Lavin and Justice Sterba concurred in the judgment and opinion.

**OPINION**

¶ 1    This matter is before the court on an interlocutory appeal by respondent, Robert Levinson (Robert), pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Feb. 26, 2010), from an order of the circuit court issued September 8, 2011, awarding the temporary exclusive possession of the marital residence, pursuant to section 701 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/701 (West 2010)), to petitioner, Robin Mitchell Levinson (Robin), for the duration of the dissolution proceedings.

¶ 2                                    I. BACKGROUND

¶ 3    The parties were married on March 28, 2004. Throughout their marriage, Robert and Robin resided together at the marital residence at issue here. They have two young children: Bennet, born in 2007, and Jacob, born in 2005. According to the record, both Bennett and Jacob have special needs. Jacob has been diagnosed with sensory processing disorder and dyspraxia, and Bennett is currently being tested for sensory processing disorder.

¶ 4    This litigation has an extensive procedural history. We will address herein those motions and hearings pertinent to the issue before us.

¶ 5    On May 12, 2010, Robin filed a petition for dissolution of marriage, alleging irreconcilable differences. She asked for custody of the children as well as exclusive possession of the marital residence. Two days later, she also filed an emergency petition for an order of protection asking that Robert be prohibited from committing physical abuse, willful deprivation, harassment, interference with personal liberty, and intimidation of a dependent.[1] Additionally, she sought restriction or denial of visitation with the children

---

[1] In this emergency petition for order of protection, Robin alleged that, on May 9, 2010, Robert grabbed her wrist, "pulled it back and forth and twisted it several times, and then he slammed it in a door while he was holding Bennett." Robert then locked himself in a room with Bennett while Robin called the police. As a result of this incident, Robin allegedly injured her wrist and Bennett sustained scratches to his stomach. Although Robin refers to this incident throughout her appellate brief, we note that this petition was voluntarily dismissed and the court made no findings regarding

because Robert was likely to abuse or endanger them during visitation, use visitation as an opportunity to abuse or harass Robin and the children, improperly detain or conceal the children, and otherwise act in a manner that is not in the best interest of the children.

¶ 6 The court appointed a child representative. It also began what the parties refer to as a "birdnesting" schedule, wherein each party occupies the marital residence during his or her parenting time, but vacates it during the other's parenting time. For example, from a court order:

"The parties shall not be in or at the martial 'home' located at 3834 Marshfield, Chicago, IL at the same time and Robert shall be allowed in the home as follows which tracks his parenting time: (a) May 14 from 3 pm to 6 pm, (b) May 15 from 3:30 pm to 6:30 pm. However Robert may pick Jake up at said home at 2:30 pm and take him to soccer that day, (c) May 16 from 9 am to 1 pm, (d) May 17, 18 & 19 Robert shall pick Jake up at school at 3:00 and return to said home to be with Bennett and Jake until 6:00 pm. *** Robin shall have the use of the home except as set forth in paragraph a-d set forth above and shall have the balance of time as her parenting time."

¶ 7 On May 21, 2010, the court allowed Robin to withdraw her emergency petition for order of protection without prejudice. In the May 21 order, the court addressed numerous issues, including parenting time through the next month:

"Robin shall have exclusive possession of the marital residence *** except during Robert's parenting time referenced herein when he shall have exclusive possession of said marital residence, Robert shall take Jake to and from OT on his Thursday parenting time as referenced above. Each party may attend all scholastic and extra-curricular activities for the children regardless of the parenting time schedule; however no other relative shall be present at such events *** the parenting schedule and all aspects of this Order is without precedent and prejudice. *** No relatives of either party shall be on the premises of said marital residence."

¶ 8 In June 2010, Robert filed a counterpetition for dissolution of marriage. He, too, asked for custody of the children and alleged that it was in the best interests of the children to be in his custody. He also filed a petition for interim relief in which he asked the court to "continue the nesting arrangement of the parties with the children in the marital residence."

¶ 9 On June 23, 2010, the court, by written order, set forth another temporary parenting schedule. Per this order, Robert was to have parenting time in the marital residence on alternating weekends from Friday at 5 p.m. through Sunday at 5 p.m. and weekday parenting time on Tuesdays from 3 p.m. through 8 a.m. and Wednesdays and Thursdays from 3 p.m. to 7:30 p.m.

¶ 10 In August 2010, Robin filed a petition for exclusive possession of the marital residence wherein she alleged that, even after court-ordered therapy sessions, the level of tension between the parties had not diminished and Robert's unpredictable behavior had jeopardized her and the children's physical and mental well-being. Further, she claimed that the

the incident.

temporary parenting agreement caused the children confusion and a lack of stability as they do not understand when each parent will be in the marital residence and do not understand where the other parent goes:

> "5. In an effort to create a temporary parenting schedule with the least disruption to the children, the Court entered a temporary Order in order for [Robert] to arrange for suitable housing that included an arrangement whereby Robin was awarded exclusive possession of the marital residence except during [Robert's] parenting time which he exercises at the marital residence.
>
> 6. Each time that the parties' [*sic*] transition between parenting time, the arriving parent stays on the front steps until the other parent exits the front door, effectively creating a 'changing of the guard.' This practice has prohibited any overlap of time by the parties within the marital residence.
>
> 7. This 'changing of the guard' is confusing to the children and contrary to their best interests of the children [*sic*] as they don't understand why Robin is waiting outside the home. This practice has been in place because as previously alleged, the tension and hostility between the parties prohibits the parties from being in the same place at the same time. When Robin leaves the residence for [Robert's] parenting time, the children express feelings of abandonment, often asking why she is leaving, where she is going, whether she has another home, does she live alone, and the like.
>
> 8. Furthermore, the temporary schedule jeopardizes the children's mental well being. Having both parties occupy the marital residence has created a lack of stability and confusion for the children because they don't know which parent will be with them at the marital residence or where the other parent is when they are not at home.
>
> 9. The children's environment would be significantly more stable if each party maintained a residence where the children could establish their own space and routine with that parent."

Robin further alleged that Robert leaves the house in disarray after his parenting time. She also stated that, while Robert owns several properties and has family in Chicago, Robin does not have an alternate residence at which she can stay when it is Robert's turn to be in the marital residence.

¶ 11    On October 12, 2010, the children's representative filed a motion for custody evaluation in which he alleged, in part:

> "Since the first date of appointment, the level of acrimony in this case has been very high. There have been Petitions and Cross-Petitions filed alleging deficiencies in the parties' parenting abilities as well as allegations and counter-allegations regarding what is consistent with the children's best interest vis-á-vis a parenting schedule. [The] Court worked very hard with the parties and the attorneys to try to resolve the custody/parenting schedule by agreement. A hearing proceeded for a full afternoon over the issue of exclusive possession which included many allegations and incidences relating to the best interests of the children and the effects of the dissolution proceedings and the actions of the parties on the children. The parties met with their attorneys and Judge Michael Hyman in a mediation session which lasted approximately four hours on September 27th

and another hour on September 28, 2010. The mediation session, which was focused on custody and parenting time, was unsuccessful. The parties continue to be at odds over the issues of joint versus sole custody and an appropriate parenting schedule consistent with the children's best interest."

The court appointed Dr. John Palen as the evaluator pursuant to section 604 of the Act (750 ILCS 5/604(b) (West 2010)).

¶ 12    Dr. Palen issued his initial section 604(b) report on May 30, 2011. In his report, he evaluated the personalities and relationships of the parties and their children and made several recommendations regarding custody and visitation. In regard to Robin, Dr. Palen noted:

"The children are attached primarily to their mother and enjoy a close, warm and trusting relationship with her. Ms. Mitchell has been their principal caretaker since birth and Jake and Bennett rely on her to meet their needs for physical and emotional sustenance. The boys feel happy and secure in her presence and experience anxiety to varying degrees when contemplating separation from her. Collateral contacts report that she is an exemplary parent in many ways. The principal parenting weakness that one could identify is that, as Mr. Levinson describes, Ms. Mitchell can have a tendency to 'hover', thereby possibly interfering with the boys' ability to function as independently as they might otherwise. She is exceedingly patient and nurturing and while one can certainly not fault her for being so, it is the rare parent who does not occasionally lose patience and raise his or her voice. Mr. Levinson is not as patient, loses his temper and although the manner in which he disciplines may not rise to a level that would cause undue alarm, from the boys' perspective it is so very different from what they experience with their mother that it is perceived as frightening and off-putting. And, as written elsewhere–the more reactive Mr. Levinson is to the boys' expression of anger toward him, the more protective Ms. Mitchell becomes, causing Mr. Levinson to interpret her actions as interference and leading to stepped up efforts to gain control. A circular process ensues that is corrosive to the boys' relationship with their father as well as to the co-parenting relationship. One might further hypothesize that the trouble Jake experiences in processing sensory data may pre-dispose him to react in an exaggerated manner to his dad's style of discipline."

Dr. Palen continued:

"The boys' relationship with their father is not on the same solid footing as is their relationship with their mother for a number of reasons. By many accounts Mr. Levinson was only tangentially involved with the children until the marital separation took place in May, 2010. To his credit he then stepped into a role that was relatively unfamiliar to him and has been diligent about asking for more time with the children since then. He has never failed to assume responsibility on his parenting time, arrives at the appointed hour, and engages in activities with the boys that they enjoy. And, like Ms. Mitchell, he has kept abreast of Jake's progress in speech and occupational therapy, as well as with both boys' general academic progress. He is an intelligent man, well read with regard to Jake's special needs as well as in the area of the importance of fathers to their sons, but

a man who despite good intentions is not as able to resonate with his sons on an emotional or empathetic level as he might want to be. He is also an individual who is accustomed to meeting goals that he sets and getting what he wants–certainly attributes that contribute to his success in the world of business but not ones that lend themselves to warm and sensitive relationships with people with whom he might want to be emotionally intimate. Findings from psychological testing reveal that 'Mr. Levinson is someone who is highly self-focused, and concerned or even preoccupied with meeting his own needs–often at the expense of paying attention to the needs of others.' This particular personality characteristic would make it challenging for Mr. Levinson to spend extended periods of time with children who are by nature unrelenting in their demands and need for attention."

¶ 13 Dr. Palen discussed the children's particular emotional sensitivities and concluded that "[t]hese children, perhaps more than others in their age range, require a consistent and predictable schedule that can serve as a secure base from which to explore their worlds."

¶ 14 Dr. Palen presented the court with a supplement to his report in August 2011. In the supplement, Dr. Palen said that he reconsidered some of his initial recommendations after reviewing the case file in preparation for his deposition. Dr. Palen recommended that Robert spend more time with the children than he originally recommended, noting:

"The challenge is that of devising a plan that meets the boys' needs for exposure to their male parent while simultaneously providing them with the high level of predictability and consistency that they need given Jake's special needs. It is my understanding that Bennett is presently being evaluated for Sensory Processing Disorder, which if diagnosed, would also suggest that he too requires a highly stable and predictable schedule–particularly during the academic year."

¶ 15 Dr. Palen stated, "Ideally, few changes should be made until the parents are living in separate residences. The boys are accustomed to the current schedule and should not be required to adjust to a different one prior to acclimating to having two homes." He recommended that the schedule should remain essentially the same but that:

"The caveat to the above recommendation is that the schedule may remain as is (whether the parents are in the same residence or separated) but only if the children are able to do well at school following the overnight during the school week. This needs to be evaluated at the end of the first six weeks of school ***." (Emphasis in original.)

¶ 16 On July14, 2011, Robin filed a motion to modify visitation, or in the alternative for *de novo* hearing, for exclusive possession of the marital residence and for other relief. Robin asked, in pertinent part, for exclusive possession of the marital residence at all times. Robert asked, in pertinent part, that the court deny Robin's motion and that the parties maintain shared possession of the marital residence, continuing with the "birdnesting" schedule that was in place by agreement and court approval since June 2010.

¶ 17 In the motion at issue, Robin made the following allegations to support her position that she should be awarded exclusive possession: (1) there remained tension between the parties at pickups and drop-offs, resulting in Robert responding in an overly aggressive manner; (2) Robin suffered "tension" caused by the co-occupancy of the marital residence; (3) Robin

does not have alternative housing or means with which to obtain same; (4) Robert has housing available to him through real estate investment properties and family members; and (5) the current visitation schedule is seriously endangering the mental and emotional well-being of the children, "the effects of which are delineated in Dr. Palen's report." In her motion, Robin also incorporated her initial petition for exclusive possession, which contained additional allegations that: (1) Robert exhibits an inability to control his emotions in dealing with Robin and the children; (2) Robert used physical violence against Robin in May 2010; (3) when Robert leaves the home after his parenting time, the house is left in disarray and in a messy condition.

¶ 18    The court held a hearing on this motion spanning five afternoons ending September 1, 2011. The court limited the hearing to two issues: exclusive possession of the marital residence and Robert's school-year overnight parenting time. We are interested here in the portion of the hearing relating to exclusive possession of the marital residence. The court heard testimony from the parties; the court's appointed section 604(b) expert, Dr. Palen; Robert's brother-in-law; and Robert's sister.

¶ 19    At the hearing, Dr. Palen testified consistently with his report and supplemental report. He testified:

"Q. [MR. HURST (attorney for respondent):] There's nothing in your report, either your initial report or your supplemental report, that says anything about any of the parties being at risk; am I correct?

A. [DR. PALEN:] That's correct.

Q. Would it be fair to say, if you considered there to be an imminent risk to either Mr. Levinson or Mrs. Levinson or the children, that that would have been contained in your report?

A. Of course, yes.

Q. Would it be fair to say that if you thought that there was a circumstance that you learned about during the course of your evaluation that seriously endangered either the parties or the children, that that would have been reflected in the report?

A. I would have had to report it, yes.

Q. Would it also be fair to say, if you learned of circumstances during your evaluation that caused you to believe that one of the parties or the children was in jeopardy, that that would have been contained in your report?

A. Yes.

Q. Is it reasonable for us to conclude, because those things are not referenced in your report, that you did not make any findings that either of the parties or the children were endangered during the course of your investigation?

A. That's correct.

Q. Would it also be correct that because there's nothing in your reports about either of the parties or the children being in jeopardy, that you made no findings that anyone was in jeopardy?

A. I addressed it in the relevant sections of the summary, yes.

Q. You did address that factor, and you found there was nothing that led to the conclusion of endangerment or jeopardy, correct?

A. That's right."

¶ 20 Dr. Palen also testified:

"Q. [MR. TOBACK (attorney for respondent):] I was asking if you agree or disagree with the following statement that is made in Robin Mitchell's sworn motion that brings us here today: The current visitation schedule is seriously endangering the mental and emotional well-being of the children. The effects of which are set forth herein and above and more fully delineated in Dr. Palen's report. Agree or disagree, sir?

A. [DR. PALEN:] I disagree."

¶ 21 Regarding the benefits of a birdnesting arrangement, Dr. Palen testified:

"Q. [MR. ROSENBERG (attorney for plaintiff):] This issue of a shared residence, I believe you stated, in the questions by Mr. Toback, that you did not believe a shared residence in toto was in the best interest of the children during the pendency of this case, correct?

A. [DR. PALEN:] Yes.

Q. Are there certain benefits to the children of the parties sharing a residence, bird nesting as they were doing?

A. Well, yes, there are.

Q. Briefly, what are the benefits to the children of the parties maintaining the status quo?

A. Well, from their perspective, they're in one location, not packing a little bag, going back and forth. From their perspective, life is consistent. The only thing that changes is mom's there sometime, dad's there at other times.

Q. Are there certain benefits to Mr. and Mrs. Levinson having separate residences relative to the children, benefits to the children, not the parties? Strictly talking about the children. Are there benefits to them, to the parties having separate residences?

A. I think so.

Q. What are the benefits to the children of the parents going–these parents going through this divorce having separate residences?

A. I can only think that because the parents, I presume, are uncomfortable with the arrangement and are at times anxious about the arrangement, that that is something that the children pick up on from time to time.

Q. And are there–you testified to certain detriments to the children of the parents residing in the same household, correct?

A. Yes.

Q. And by that, I mean the shared residence/nesting that they're doing, correct?

A. There are pros and cons to it, yes.

Q. And the cons you said were the friction and the tension and the anxiety of the

parents coming back and forth, correct?

A. Yes.

Q. What are the detriments to the children of the parents having separate residences?

A. It will require a period of adjustment, settling in to a new routine. That will take some time. It's more inconvenient for them, but they will eventually have to do that.

Q. I was going to say, it's eventually going to happen, isn't it?

A. Yes.

Q. *** The parents having separate residences now and the fallout, whatever that may be to the children, is it as good to do that now as any other time; i.e. after the divorce?

A. Well, the drawback now, of course, is school is starting. So it's not an ideal time to affect [*sic*] a major change like that.

\* \* \*

Q. Can it benefit the children to begin to deal with the true reality, which is mom and dad are getting divorced; they're going to have two toothbrushes and two houses and two bedrooms and two of everything?

A. Yeah, they're going to have to eventually, yes.

Q. Now, these–and one last thing. You concluded, if I'm not mistaken, that the overall balance, benefit to the children, for the parents to be in separate households, correct?

A. Yes.

\* \* \*

Q. I want to be certain I am clear. That is your opinion, right, that the parties being in separate residences is consistent with the children's best interest?

A. Ultimately. The timing is important."

¶ 22 Dr. Palen testified that consistency was particularly important for the children involved in this case:

"Q. [MR. ROSENBERG (attorney for plaintiff):] And, in fact, the kids would know that if they're at their father's house, they're with their father, correct?

A. [DR. PALEN:] Yes.

Q. And they would know, if they're at their father's house, their mother's not coming home that day; they're not looking when mommy's coming home? Mommy's not coming home; they're at dad's house, correct?

A. That's right.

Q. Could that reduce the confusion for the children by knowing they have dad's house and mom's house, dad's time and mom's time?

A. It could.

Q. Do you believe it's true or not true that the mental well-being of the children is jeopardized by the continued occupancy of the parents in the marital residence?

A. I don't think it's jeopardized. I think it just postpones the inevitable."

The court also heard testimony and evidence relating to the children's schooling as well as their special needs. At the time Dr. Palen issued his reports, Jake had been diagnosed with a sensory processing disorder and dyspraxia. Dr. Palen testified that Jake was scheduled to begin taking Ritalin within the next month to treat attention deficit hyperactivity disorder. When questioned about the upcoming medication regimen, Dr. Palen testified that there should be "as much consistency as possible so that the psychiatrists have reliable data." Dr. Palen testified that the children were doing well in school, that they do well in peer relationships, and that they receive appropriate services.

¶ 23    Robin testified about several problems that began during the 15 months since the birdnesting arrangement began. When asked if Robin perceived a correlation between the boys' behavior and the birdnesting arrangement, she responded that they are "much more aggressive with each other" after spending time with Robert. According to Robin, Jake's "anxiety increased, and he's become more emotional, more aggressive, more easily frustrated." In April 2010, he began wetting his pants and wearing the same clothing day and night. She also testified that when Jake sees his father come to the marital residence, Jake says he "doesn't want daddy to come or he'll block the door when it's time for [Robert's] parenting time."

¶ 24    Robin testified that the birdnesting arrangement is also stressful for her. She feels anxious about sharing the home. She has no privacy in her own home, and because she does not have another home to live in, she has no privacy in a residence outside of the marital home. Robin keeps her personal belongings in padlocked storage boxes. She takes time away from her children in order to pack and unpack her bags. When she packs, the children ask where she is staying, why she is staying with another family, and why she is not staying with her own family.

¶ 25    Robin also testified that, when Robert leaves after his parenting time at the marital residence, the house is in disarray. She testified that Jake's special sensory tools, which are necessary for his therapy, are often missing, misplaced, or broken. She testified:

"Q. [MR. TOBACK (attorney for plaintiff):] What would change if you and [Robert] had separate residences?

A. [ROBIN LEVINSON:] Well, the stress levels would be greatly reduced for me and anxiety that I experience about having to share a home and not knowing what the home is going to look like when I come home. The other thing is that it's extremely time consuming to try to get the house back into the shape that it needs to be for the boys and for them to operate in the best possible situation that they can given their special needs. And it's extremely time consuming. All of my time in the home is generally with the boys. To have to clean and organize with them in the house and be in this constant state of trying to catch up is extremely difficult. Also with the fact that I have no privacy in the home. And, you know, I think it would be beneficial for the boys to see us in two separate living spaces."

¶ 26    Robert testified that, while he recognized that the nesting schedule was not supposed to be permanent, it is the best arrangement at the present time:

"Q. [MR. KLEIN (attorney for respondent):] Tell me what you believe is best in terms of this nesting arrangement.

A. [MR. LEVINSON:] Well, I believe that the nesting arrangement is the best of the alternatives that we have presently.

Q. Why?

A. Because it is a–an arrangement that allows for the children–that serves to maximize the stability for the children.

Q. How so?

A. Well, the children have the continuity of their home, what's clearly their home. And it's a very comfortable home for them. And it's the only home they've ever known. They were brought from the hospital, each of them, to this home. And they each have their own bedrooms, their playroom, their kitchen. And the nesting arrangement allows for the children to have that stability of the home. And the only difference is, which they understand, is that mommy and daddy take turns in being with them when in the home. So they're not subjected at this point to the disruption of having to pack up and move out for periods of time and to go to an inferior environment, by every measure, size, quality, just in every way. It's a small apartment compared to a large, luxurious home. So my belief is that it is best for the children to have the stability and this continuity and to minimize the disruption and the impact of our divorce. And I believe that the nesting arrangement allows for that. It also allows for the stability of the children to have substantial amounts of time with each parent and to enjoy the bond and the love that they receive from each parent. So it's my belief that it is the best–excuse me, that it is the best of the alternatives that we have available.

Q. You recognize that at some point the nesting will end, correct, when the divorce is over?

A. Of course. Of course. Yes."

¶ 27     On September 8, 2011, the trial court granted Robin's motion in a memorandum order. It stated that "under these circumstances the mental well-being of Robin Mitchell Levinson and Jacob and Bennett is jeopardized by occupancy of the marital residence by both spouses," and granted Robin exclusive possession of the marital residence pursuant to section 701 of the Act until the final determination of the cause. The court found that Robin testified credibly regarding the negative effects of the shared household on both herself and the children. It noted that Robert disagreed that the children continue to exhibit stress-related behaviors. The court found Robert's denial of Dr. Palen's conclusion that the current birdnesting arrangement causes unnecessary stress and tension for everyone and is not in the best interest of the children to be incredible.

¶ 28     The finding that jeopardy exists was based on the following facts and testimony: (1) high personal stress experienced by Robin and her observations of the behaviors that suggest the high levels of stress experienced by the children; (2) the children's attachment to Robin, who has been their primary caretaker since birth, and the inference that they experience stress due to the birdnesting arrangement both directly and also indirectly from the stress experienced by their mother; (3) the fact that the birdnesting has lasted 15 months, only 3 months short

of the deadline for the court's final decision on custody under the Illinois Supreme Court rules (although the court acknowledged that it is unlikely the custody deadline would be met due to the pending section 604.5 evaluation); and (4) that by continuing the birdnesting, the court would "enable" the parties to continue their power struggle to the detriment of the children and the ultimate resolution of the case.

¶ 29    Robert filed the instant interlocutory appeal, asking this court to reverse the order of the trial court.

¶ 30                                    II. ANALYSIS

¶ 31    Robert contends that the court erred by improperly employing too broad a definition of "jeopardy" as it is used in the Act. Specifically, Robert takes issue with the court's statement: "Robert Levinson points to dictionary definitions of jeopardy which include danger, hazard, and peril. But the terms 'jeopardy' and 'well-being' must be construed liberally to promote the underlying purposes of the Act. The legislative purposes are undermined by defining the terms narrowly to, for example, require evidence of prior harm or serious endangerment, i.e., a situation that a mental health professional would be mandated to report to the Department of Children and Family Services." Robert argues that the court should have given effect to the "plain meaning" of "jeopardy." We agree.

¶ 32    "Section 701 of the Illinois Marriage and Dissolution of Marriage Act [citation] governs the granting of exclusive possession of the marital residence to either spouse pending final determination of the cause." *In re Marriage of Hofstetter*, 102 Ill. App. 3d 392, 395-96 (1981).

¶ 33    Section 701 of the Act reads:

> "§ 701. Marital Residence–Order granting possession to spouse. Where there is on file a verified complaint or verified petition seeking temporary eviction from the marital residence, the court may, during the pendency of the proceeding, only in cases where the physical or mental well being of either spouse or their children is jeopardized by the occupancy of the marital residence by both spouses, and only upon due notice and full hearing, unless waived by the court on good cause shown, enter orders of injunction, mandatory or restraining, granting the exclusive possession of the marital residence to either spouse, by eviction from, or restoration of, the marital residence, until the final determination of the cause. No such order shall in any manner affect any estate in homestead property of either party." 750 ILCS 5/701 (West 2010).

Accordingly, pursuant to section 701 of the Act, the court has the authority to grant exclusive possession if (1) a party has filed a verified petition seeking exclusive possession of the marital residence, and (2) the physical or mental well-being of either spouse or their children is jeopardized by the occupancy of the marital residence by both spouses. 750 ILCS 5/701 (West 2010). We review orders granting exclusive possession pursuant to section 701 under a manifest weight of the evidence standard. *In re Marriage of Hofstetter*, 102 Ill. App. 3d at 396. A judgment is against the manifest weight of the evidence when the opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence. *In re Marriage of Karonis*, 296 Ill. App. 3d 86, 88 (1998).

¶ 34	The primary rule of statutory construction is to ascertain and give effect to the intent of the legislature. *People v. Ramirez*, 214 Ill. 2d 176, 179 (2005). The language of a statute is the best means of determining legislative intent, and where the statutory language is clear and unambiguous, its plain meaning will be given effect. *Ramirez*, 214 Ill. 2d at 179. "[W]ords and phrases should not be construed in isolation, but must be interpreted in light of other relevant provisions of the statute." *In re Detention of Lieberman*, 201 Ill. 2d 300, 308 (2002). "Accordingly, in determining the intent of the legislature, the court may properly consider not only the language of the statute, but also the reason and necessity for the law, the evils sought to be remedied, and the purpose to be achieved." *Id.*

¶ 35	Section 102 of the Act provides that the Act "shall be liberally construed and applied to promote its underlying purposes." 750 ILCS 5/102 (West 2010). The purposes of the Act are, in relevant part, to "mitigate the potential harm to the spouses and their children by the process of legal dissolution of marriage," and "secure the maximum involvement and cooperation of both parents regarding the physical, mental, and emotional well-being of the children during and after litigation." 750 ILCS 5/102(4), (7) (West 2010); *In re Marriage of Wade*, 408 Ill. App. 3d 775, 780 (2011).

¶ 36	As the parties and the trial court acknowledge, there are very few reported cases construing section 701, and none of those give specific meaning to the terms "well-being" or "jeopardized." Of the cases that have interpreted section 701, all suggest that section 701 imposes a high bar for exclusive possession. See, *e.g.*, *In re Marriage of Lima*, 265 Ill. App. 3d 753 (1994); *In re Marriage of Lombaer*, 200 Ill. App. 3d 712 (1990); *In re Marriage of Hofstetter*, 102 Ill. App. 3d 392. We have found nothing to suggest that a court should define "jeopardy" in the context of section 701 in a more expansive manner. Moreover, we believe the underlying purposes of the Act (mitigating potential harm to spouses and children as well as securing maximum involvement of the parents regarding the well-being of the children during dissolution proceedings) are served by giving effect to the plain meaning of "jeopardy" as it is used in section 701. See 750 ILCS 5/102(4), (7) (West 2010).

¶ 37	Although Dr. Palen opined that mutual occupancy of the marital residence in this case causes everyone undue stress and is not in the best interest of the Levinson children, he declined to characterize the circumstances as dangerous for the children. Robin testified that her mental well-being and the well-being of the children are jeopardized by the continued co-occupancy of the marital residence because of the high personal stress she experiences as a result of this birdnesting agreement as well as her observations of the behaviors of the children that suggest the high levels of stress the children likewise experience. The trial court found that "[i]t is reasonable to infer that these children experience stress in the birdnesting arrangement both directly and also indirectly from the stress experienced by their mother, the person to whom they are primarily attached." Even considering all of this to be true, and even recognizing that Robin and the children do experience "stress" due to the birdnesting arrangement in the marital household, this is still not sufficient under section 701 to support an order of exclusive possession.

¶ 38	The established case law provides guidance as to what types of situations are considered to jeopardize one's well-being under section 701 and what types are not. We find *In re Marriage of Hofstetter*, 102 Ill. App. 3d 392, and *In re Marriage of Lima*, 265 Ill. App. 3d

753, instructive regarding what is and is not considered jeopardy in the context of section 701. In *In re Marriage of Hofstetter*, 102 Ill. App. 3d 392, the appellate court affirmed the award of exclusive possession of the marital residence to the wife pursuant to section 701. In that case, the parties had been married for approximately 10 years. The wife, who filed for exclusive possession, testified that her husband yelled at her, hit her with his fist, and beat her over the head with his gun. She was frightened. She testified that he pointed the gun at her and fired it twice, he broke her teeth, he threatened to kill her, he struck her with an iron, and he locked her out of the house for one week. The husband admitted that he struck and beat his wife. He denied having hit her with the gun. On appeal, this court found there was "sufficient evidence for the trial [court] to determine that the husband's presence in the marital home would jeopardize the wife's physical and emotional well-being." *Id*. at 396.

¶ 39    In *In re Marriage of Lima*, 265 Ill. App. 3d 753, the trial court awarded the temporary exclusive possession of the marital residence to the wife pursuant section 701. The husband appealed by interlocutory order, and the appellate court reversed. The facts of that case are as follows: the parties were married approximately 20 years and had two children, ages 17 and 18. The husband filed a petition for dissolution of marriage, and the wife filed a counterpetition for dissolution and, in pertinent part, a petition for exclusive possession of the marital residence pursuant to section 701. At the hearing on the motion, the wife testified that, three years previously, her husband had intercourse with her without her consent. After this event, the husband and wife continued to live in the house together. The wife prepared meals and did the husband's laundry. They slept in different bedrooms both before the nonconsensual intercourse and after. She testified as an adverse witness that, after the nonconsensual intercourse, she did not care if the husband was in the house. The wife testified that she was a diabetic who used insulin each day. She testified, in response to the court's questioning, that diabetic reactions manifest themselves from stress, and that her diabetic reactions had occurred more frequently during the past year. She also testified that, since the filing of the dissolution proceeding, the reactions got worse and more frequent. The trial court awarded the wife the exclusive possession of the marital residence for the duration of the dissolution proceedings, stating " 'I do not believe, for the record, that Mr. Lima would do anything directly or indirectly either physically or mentally to cause any further acts but I believe his presence there, given the facts that have existed, will definitely jeopardize Mrs. Lima's physical and/or mental well being [*sic*].' " *Id.* at 757. The husband appealed.

¶ 40    The appellate court reversed the decision of the trial court. In so doing, it found:

"It must appear that a conclusion opposite to that reached by the trier of fact is clearly evident for a judgment to be against the manifest weight of the evidence. Judith's testimony on January 6, 1994, that on August 4, 1990, she felt used and described the instance of sexual intercourse as lacking romance was the last time intercourse occurred. Prior to August 4, 1990, while John occupied the basement sleeping quarters and Judith occupied the master bedroom, they had intercourse. Subsequent to August 4, 1990, while John remained in the marital residence, and after he left the residence, John and Judith did not have intercourse, nor was there any evidence of a suggestion of engaging in intercourse, either consensually or nonconsensually. The one incident of intercourse on August 4, 1990, does not support the conclusion that the physical or mental well-being

-14-

of Judith is jeopardized." *Id*. at 756-57.

¶ 41 The appellate court also found that, while the wife was diagnosed a diabetic in 1991 and takes insulin daily, "[t]he *** intake of insulin and self-diagnosed drop in blood sugar level resulting in a diabetic reaction does not support the conclusion that the physical or mental well-being of Judith is jeopardized." *Id.* at 757.

¶ 42 It also noted that the trial court's use of and/or language in its ruling was unclear as to whether the exclusive possession was awarded because of the nonconsensual intercourse or because of the increased diabetic reactions, or both. *Id*.

¶ 43 We find *In re Marriage of Lima* instructive to our decision today. In *Lima*, the wife alleged that her well-being was jeopardized due to stress caused by an incident of nonconsensual intercourse as well as health problems stemming from the stress of the dissolution proceedings. The appellate court found each of these reasons insufficient under the standards of section 701 of the Act. *Id*. at 757-58. In the same way, here, Robin alleged that sharing the marital residence with Robert causes her stress. She also alleged that the children feel stress and confusion due to the lack of stability as pertains to the birdnesting arrangement. Although she refers to the alleged altercation of May 9, 2010, we note that the emergency petition for order of protection was voluntarily dismissed and the trial court did not make any findings regarding the incident. Moreover, Dr. Palen testified that he disagreed with Robin's assessment that the birdnesting visitation schedule "is seriously endangering the mental and emotional well-being of the children." Just as in *Lima*, this combination of factors is clearly not sufficient under section 701 to constitute jeopardy.

¶ 44 It is clear from the evidence before us there was no jeopardy to either the physical or mental well-being of Robin or the children prior to September 8, 2011. Nor was there evidence of any future jeopardy to the physical or mental well-being of Robin or the children. We recognize the trial court's concern that possession of the marital residence is being used as a tool in the arsenals of Robert and Robin, two individuals involved in a contentious divorce. Nevertheless, we are not free to set our own standard, but are bound by that which the legislature has set forth by statute. Accordingly, we find that the judgment of the trial court is unsubstantiated by the evidence and is against the manifest weight of the evidence.

¶ 45 Next, Robert also contends that, "[e]ven if there were some basis to look beyond the plain meaning of jeopardy, a liberal construction of 'jeopardy' does not mitigate against the standards for injunctive relief." However, because of our decision herein, we need not address this issue.

¶ 46                                III. CONCLUSION

¶ 47 Accordingly, for the foregoing reasons, the judgment of the circuit court of Cook County is reversed.

¶ 48      Reversed.