2025 IL App (1st) 242436-U

No. 1-24-2436

Order filed March 31, 2025

Third Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| CARLA N. TAYLOR, | ) | Appeal from the |
| | ) | Circuit Court of |
| Petitioner-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 22 D 8894 |
| | ) | |
| JESSE TAYLOR, | ) | Honorable |
| | ) | H. Yvonne Coleman, |
| Respondent-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE LAMPKIN delivered the judgment of the court.
Justices Reyes and D.B. Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:   The trial court did not err in granting petitioner's motion for entry of a bifurcated judgment for dissolution of marriage, which was heard on an emergency basis, and awarding exclusive possession of the marital residence to petitioner.

¶ 2    This matter is before this court on an interlocutory appeal by respondent Jesse Taylor, pursuant to Illinois Supreme Court Rule 307(a)(1) (eff. Nov. 1, 2017). The trial court granted petitioner Carla Taylor's motion for entry of a bifurcated judgment for dissolution of marriage and

other relief, which was heard on an emergency basis. In granting the motion, the court awarded exclusive possession of the marital residence to Carla.

¶ 3    On appeal, Jesse argues that the trial court erred by (1) finding that Carla's motion constituted an emergency that warranted an expedited hearing, (2) granting Carla exclusive possession of the marital residence without sufficient evidence of imminent danger to her mental or physical well-being, and (3) bifurcating the dissolution of marriage proceeding after the parties agreed to reset the trial date.

¶ 4    For the reasons that follow, we affirm the judgment of the circuit court.[1]

¶ 5                                    I. BACKGROUND

¶ 6    Carla and Jesse were married in June 1998 and have two now-emancipated children. In September 2002, the parties acquired a house located in South Holland, Illinois. In November 2022, Carla initiated this dissolution of marriage proceeding. Jesse filed a counterpetition. Throughout the marriage and during the dissolution proceedings, the parties continued to reside together in the marital residence. Although emancipated, both children continued to reside in the marital residence with the parties. The parties' youngest child turned 18 years old in March 2024 and began her freshman year of college in the fall of 2024.

¶ 7    In November 2024, Carla moved the court for entry of a bifurcated judgment for dissolution of marriage and other relief. Specifically, she alleged that she feared for her safety based on Jesse's conduct of acquiring and bringing a firearm into the marital residence suddenly in July 2023 without informing her. The divorce proceeding was very contentious and she learned that he

---

[1]In adherence with the requirements of Illinois Supreme Court Rule 352(a) (eff. July 1, 2018), this appeal has been resolved without oral argument upon the entry of a separate written order.

acquired the firearm when she saw that he received mail from the State of Illinois which contained a Firearm Owner's Identification (FOID) card. She believed that Jesse slept with the firearm every night, so she would lock the door to her bedroom every evening out of fear. Carla also alleged that Jesse's delays in discovery compliance and change of legal representation demonstrated his clear intent to hinder the divorce process. She requested that the court dissolve the marriage immediately to relieve her from the continued emotional and psychological stress caused by Jesse's conduct. Specifically, she asked the court to enter a bifurcated judgment for dissolution of marriage *instanter*, grant her exclusive possession of the marital residence, order Jesse to vacate the home within 30 days, and reserve all other issues related to this matter, including the allocation of property and marital debt obligations. Carla did not seek this relief earlier because she thought the divorce would have been concluded at a trial in November 2024. However, she now realized that the trial would not begin until late March 2025, and continuing to live in the house with Jesse under so much emotional distress was unbearable.

¶ 8    In his response, Jesse argued that the matter was not an emergency because discovery was outstanding and the motion was an attempt to evict him from the home. He also argued that he has been a legal gunowner since July 2023 and the parties had no history of domestic violence, threats, or police involvement.

¶ 9    The court found that the parties' living conditions presented serious circumstances, "articulated in the emergency motion itself," that could possibly cause some sort of injury to Carla and thus the situation constituted an emergency, warranting immediate action. The court moved forward with an evidentiary hearing, during which both Carla and Jesse testified.

¶ 10    The evidence showed that Jesse was a bank credit officer and earned about $150,000 a year. Carla was a financial analyst, primarily worked at an office downtown, and earned about $250,000 a year. They each paid 50% of the marital expenses in the marital residence. They lived in a two-story home with a basement. Jesse worked remotely from the home's basement. Sometimes Carla worked remotely from a home office on the first floor. Carla slept upstairs in the guest room and Jesse slept upstairs in the master bedroom. Usually, he and Carla only crossed paths in the kitchen or passing through the family room during the day. However, he claimed that she would enter the master bedroom without knocking while he was in there, and go to the sitting room to do her hair or get clothes from the master closet.

¶ 11    Jesse testified that he purchased a "burner gun," which shoots pellets, before he purchased his firearm. He got the burner gun for safety because he would jog early in the morning in the dark in the forest preserve. He applied for a license and purchased the firearm after Carla filed the petition for dissolution of marriage. He had never purchased a firearm during their 26 years of marriage and never discussed with Carla his intent to purchase a firearm. He sleeps with the firearm in the home. Specifically, he places the unloaded firearm in its case and places the case on the floor next to his bed every night. He keeps the firearm by his bedside in case someone would break into the house, but he acknowledged that the parties never had a problem with any home break-ins. He did not walk around the house brandishing the burner gun or the firearm; they were always secure in their cases.

¶ 12    Jesse was not aware that his daughter had suicidal thoughts or attempts. He explained that he contacted her weekly and sometimes every other day via text and she never indicated that she was emotionally distraught. Everything seemed fine during their last interaction when they played

tennis, and she seemed happy. He stated that if he had to move out of the home, he was not sure whether he would qualify for a loan.

¶ 13    Carla testified that before July 2023, Jesse was carrying a case around the house and would leave the house carrying the case. She and her daughter wondered what the case was, so Carla took a photograph of it and looked it up online. She learned that it was a case for carrying a burner gun. When Jesse's FOID card arrived in the mail, Carla contacted her attorney, who contacted Jesse's attorney and was told that Jesse had multiple guns at the time but they were locked up. Carla was concerned about the timing of the gun purchase. She knew that Jesse had paid prostitutes for sex, and he said that he had stopped that activity because he was worried that the prostitutes might have a pimp. Also, Jesse had taken out significant loans, so Carla wondered if he was in trouble due to his activities or being blackmailed. She also knew that he took $20,000 out of a trust he managed for his aunt to pay himself. That aunt had two sons who were incarcerated, so Carla was concerned that Jesse's frivolousness with money could put her family in danger if those men were released from jail. Carla feared for her safety and explained that the tension in the home was

> "as thick as you can imagine. We don't talk to each other. We pass each other. I don't look at him. I try to keep my distance, especially when I found out about the gun. The air is so thick. The children—it's tense. And it's been this way for two years. So I stay out of his way."

She explained that Jesse woke up at 4:30 a.m. every day and left the house, so sometimes she would be in the master bedroom getting ready for work when he returned home later in the morning. Usually, however, she had left for work before Jesse returned home. She explained that

the guest bedroom where she slept was too small to hold her clothes and other belongings. She did not use the master bathroom; she used the downstairs guest bathroom instead.

¶ 14    Carla testified that she was her daughter's closest confidante, and her daughter told her multiple times that she has thought about suicide since 2020. Her daughter was fragile, in therapy, and taking medication for anxiety. Carla learned about Jesse seeing prostitutes in August 2019, but Carla stayed in the home and engaged in marriage counseling because she wanted stability for her daughter. So Carla moved into the small guest bedroom. Then, the Covid-19 lockdown happened, so Carla did not file her divorce petition until 2022, when "things opened up."

¶ 15    Carla explained that she filed her motion for bifurcation of the judgment and exclusive possession of the house because she

"felt like a sitting duck, honestly, in a house with a very tense divorce situation. And I want the Court to realize that this man has a gun in the house and we're going through a very contentious divorce, and *** [i]f something sets anyone off mentally, they are liable to do something that you wouldn't think they would do, and I'm in that situation where Mr. Taylor could do something, anyone could, you know? The mind is fragile.

And so I don't want to sit another five, six months literally living in a 10x10 room with the room [*sic*] closed."

Carla testified that she locks her bedroom door every night and was afraid to go into the master bedroom because the gun was there and

"you never know if someone is imbalanced living in the situation and they have a firearm that they never had before. What would set someone off?

And so I don't want to sit another five months in this situation with my life on the line."

¶ 16    She stated that, in addition to taking out loans and removing money from a 401(k) account, Jesse was trading over $700,000 in securities without notifying Carla, which put her job at risk because such transactions had to be disclosed. In addition to dealing with stress concerning her daughter's well-being, Carla was not operating at "100%" at her job, where she often worked 12-hour days. Carla testified that if Jesse was not in the house, the situation would be better for her emotionally and physically. Moreover, she was willing to pay all the bills and expenses for the home if given exclusive possession of it, which would free up $4,500 of Jesse's money every month and thereby enable him to find alternative housing.

¶ 17    Carla also testified that Jesse's conduct and delays throughout the dissolution proceedings further heightened her distress. She alleged that he repeatedly delayed the process by failing to provide necessary documents and information during discovery, changing legal representation on the eve of trial, and making repetitive discovery requests through his new counsel. Carla testified that Jesse's actions significantly disrupted the proceedings and exacerbated her emotional distress.

¶ 18    After hearing the testimony of the parties and arguments of counsel, the court granted Carla's motion for bifurcation and awarded her exclusive possession of the marital residence. The court made the following findings and ruling:

"It's clear to the Court from the testimony that the petitioner, Mrs. Taylor does fear for her safety, particularly with the—Mr. Taylor owning a gun and having a gun near him every night and carrying it with him.

It's also clear to the Court that she has some valid concerns about their daughter's mental instability. This [family] is under some tremendous stress due to this contentious divorce proceeding. And as we all probably know, divorce proceedings can be very stressful and emotional, but particularly in cases like this where parties continue to reside together. It makes it even more difficult.

In this situation, the parties don't communicate with each other. They're living separate lives, but they're residing in the same home.

Mr. Taylor is able to support him[self] if he moves into an apartment temporarily or until he can find or purchase a home, if that's what he decides to do. During that time Mrs. Taylor has agreed and has told the court that she will take care of the mortgage and all the household expenses.

And in the meantime, this Court believes that this marriage needs to be dissolved. So the Court finds there are legitimate reasons to bifurcate this proceeding and reserve jurisdiction regarding the division of the marital property and all other marital assets.

As to the exclusive possession of the marital home, the Court concludes that Mr. Taylor is [in] a position to be able to move out, and the Court needs to set a time frame for that."

¶ 19   After discussions with the attorneys, the court gave Jesse 48 days to vacate the marital home and deliver exclusive possession of the residence to Carla. After a short recess, the court proceeded with the prove-up of the bifurcated judgment. Following the prove-up, the court entered a bifurcated judgment for dissolution of marriage. All other issues related to the matter, including but not limited to the division, characterization, calculations, and allocation of property; the

determination and allocation of marital debt obligations; the parties' respective dissipation claims; and any other financial issues were reserved for further determination by the court, which retained jurisdiction to resolve those issues.

¶ 20    Jesse timely appealed, arguing that the trial court abused its discretion by (1) finding that Carla's emergency motion constituted an emergency warranting an immediate hearing, (2) granting Carla exclusive possession of the marital residence without sufficient evidence of imminent danger to her mental or physical well-being, and (3) bifurcating the proceedings for dissolution of marriage after the parties had agreed to reset the trial date.

¶ 21                                II. ANALYSIS

¶ 22                             A. Emergency Motion

¶ 23    Jesse argues that the evidence did not support hearing Carla's motion on an emergency basis because no element of harm supported her need for exclusive possession of the marital home on an expedited basis. Jesse argues that, for Carla's motion to qualify as an emergency, she had to establish a clear and present risk of irreparable harm that necessitates immediate judicial intervention. According to Jesse, this meant that Carla, consistent with this court's ruling in *Creaser v. Creaser*, 342 Ill. App. 3d 215, 220 (2003), had to show "immediate danger of further abuse" before the court could grant her exclusive possession of the marital home. Jesse contends Carla's belief that something could happen someday was not enough to support hearing her motion on an emergency basis. See *In re Marriage of Schmitt*, 321 Ill. App. 3d 360, 371 (2001) ("allegations consisting of mere opinion, conclusion, or belief are insufficient to support the issuance of a preliminary injunction" and a request for an injunction "must plead facts that clearly establish a right to injunctive relief").

¶ 24     We review the trial court's decision to treat an emergency motion on an expedited basis for an abuse of discretion. See *id.* at 371 (the reviewing court will not overturn the trial court's determination to grant a preliminary injunction absent a manifest abuse of discretion); *In re Commissioners of Banks and Real Estate*, 327 Ill. App. 3d 441, 476 (2001) (an abuse of discretion occurs when no reasonable person would take the position adopted by the trial court or where the trial court acts arbitrarily, fails to employ conscientious judgment, and ignores recognized principles of law). Cook County Circuit Court Rule 13.4(a)(ii) (eff. Jan. 6, 2017) outlines the legal framework governing the treatment of a matter as an emergency in a family law case in Cook County. This rule provides that "[f]acts identifying the nature of the sudden or unforeseen circumstances which give rise to the emergency and the reason why the matter should take precedence shall be stated with particularity in an affidavit or verification in support of the emergency motion." *Id.*

¶ 25     Carla's motion and affidavit complied with the requirements of Rule 13.4(a)(ii). Her verified motion and attached affidavit detailed the exacerbating threat to her safety and well-being due to the mentally and emotionally stressful home environment, Jesse's acquisition of a firearm after Carla filed her divorce petition, the ongoing presence of the firearm in the home and at Jesse's bedside every night, and the impact of delays in the proceedings.

¶ 26     Jesse argues that the evidence did not support adjudicating this matter with a hearing on an emergency basis and that no element of harm supported a need for exclusive possession on an expedited timeline. To support his argument, Jesse cites *Creaser v. Creaser*, 342 Ill. App. 3d 214, 217 (2003), where this court reversed the denial of the husband's motion to vacate *nunc pro tunc* an emergency order of protection granting exclusive possession of the parties' residence to the

wife. In *Creaser*, the wife filed a petition for an emergency order of protection granting her exclusive possession of the residence pursuant to the Illinois Domestic Violence Act of 1986 (Domestic Violence Act) (750 ILCS 60/101 *et. seq.* (West 2002)). The wife alleged in her petition that the husband accused her of stealing money and tried to leave the room, but the wife stood in front of him, holding their baby. *Creaser*, 342 Ill. App. 3d at 217. The wife alleged that the husband grabbed her left arm to push her out of the way and pulled her right shoulder into the doorframe as he went through the front door. *Id.* She alleged that she noticed bruises on her left bicep the next day. *Id.* At the *ex parte* hearing on her emergency motion, the wife stated that the reason for the petition was to retrieve her belongings out of the house because the husband had changed the locks. *Id.* The wife did not state whether the husband had ever abused her in the past or whether she feared that he would abuse her in the future. *Id.* at 217-18. The trial court entered an emergency order of protection giving the wife exclusive possession of the residence and set the matter for a hearing on a plenary order of protection. At that subsequent hearing, the court stated that the husband had touched the wife inappropriately, but the wife had interfered with his ability to leave. *Id*. at 218. The court entered a mutual restraining order that prohibited physical contact between the parties, ordered the wife to give keys to the house to the husband, and denied the husband's motion to vacate the emergency order of protection. *Id.* Thereafter, the court denied the husband's motion to reconsider the denial of the motion to vacate. *Id.*

¶ 27    On appeal, this court found that the wife did not make the showing necessary for issuance of an emergency order of protection, for the remedy of a grant of exclusive possession of the residence, under section 217(a)(1)(ii) of the Domestic Violence Act, which required the petitioner to establish that

"*the immediate danger of further abuse of petitioner by respondent*, if petitioner chooses or had chosen to remain in the residence or household while respondent was given any prior notice or greater notice than was actually given of petitioner's efforts to obtain judicial relief, outweighs the hardships to respondent of an emergency order granting petitioner exclusive possession of the residence or household." (Emphasis added.) 750 ILCS 60/217(a)(1)(ii) (West 2002).

Specifically, this court ruled that (1) section 217(a)(1)(ii) of the Domestic Violence Act required the trial court to weigh the danger of further abuse against hardship to the respondent, and (2) although the trial court made some inquiry into the potential hardship to the husband, the court abused its discretion by issuing the emergency order without eliciting any information relevant to the likelihood of further abuse. *Creaser*, 342 Ill. App. 3d at 221.

¶ 28    Jesse's reliance on *Creaser* is misplaced because that case is distinguishable. Here, Carla did not seek *ex parte* relief under section 217(a)(1)(ii) of the Domestic Violence Act. Rather, Carla sought relief under section 501(b) and (c-2) of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/501(b), (c-2) (West 2022)). Section 501(b) provides that the "court may issue a temporary restraining order without requiring notice to the other party only if it finds, on the basis of the moving affidavit or other evidence, that *irreparable injury* will result to the moving party if no order is issued until the time for responding has elapsed." (Emphasis added.) 750 ILCS 5/501(b) (West 2024). The record indicates that Jesse had notice of Carla's emergency motion and participated in the hearing that decided whether the pled allegations warranted an expedited hearing. Section 501(c-2) provides that the court may, *inter alia*, grant exclusive possession of the marital residence to either spouse during the pendency of the divorce proceedings

"only in cases *where the physical or mental well-being of either spouse or his or her children is jeopardized* by occupancy of the marital residence by both spouses, and only upon due notice and full hearing, unless waived by the court on good cause shown *** until the final determination of the cause ***. No such order shall in any manner affect any estate in homestead property of either party. In entering orders under this subsection (c-2), the court shall balance hardships to the parties." (Emphasis added.) 750 ILCS 5/501(c-2) (West 2022).

¶ 29 Section 501(c-2) essentially replaced former section 701 of the Act (750 ILCS 5/701 (repealed by Pub. Act 99-90, § 5-20 (eff. Jan. 1, 2016)), which previously governed the granting of exclusive possession of the marital residence to either spouse pending final determination of the cause. Illinois law, specifically case law decided under former section 701, supports the trial court's decision to address emergencies immediately when the well-being of a party or the children is at risk. *In re Marriage of Levinson*, 2012 IL App (1st) 112567, ¶ 34 (the court has authority to take urgent action under circumstances where continued cohabitation jeopardizes the physical or mental well-being of either spouse or their children); *In re Marriage of Engst*, 2014 IL App (4th) 131078, ¶¶ 24, 34 (same).

¶ 30 Here, the trial court found that the alleged living conditions presented serious circumstances that could possibly cause some sort of injury to Carla. The court's decision to treat Carla's motion as an emergency was neither arbitrary nor capricious but was a reasoned response to the urgent safety concerns Carla presented. The court also considered the alleged detrimental impact of the delay in the proceedings on Carla's safety and psychological well-being. The verified petition and affidavits detailed Jesse's alleged pattern of intentional delays, which Carla alleged

significantly exacerbated her emotional and psychological stress. By treating the motion as an emergency, the court alleviated the prolonged distress caused by the delayed trial, ensuring a timely and effective resolution of Carla's alleged urgent safety concerns.

¶ 31    Based on our review of the record, we conclude that the trial court acted within its discretion to adjudicate on an emergency basis Carla's motion for entry of a bifurcated judgment for dissolution of marriage and other relief, requesting exclusive possession of the marital residence.

¶ 32                    B. Exclusive Possession of the Marital Residence

¶ 33    Jesse argues that the trial court's decision to award Carla exclusive possession of the home failed to maintain the parties' status quo before the entry of a final judgment resolving all matters of the marital estate and failed to balance the hardships of the parties since Carla earned substantially more money than him and he primarily worked from the marital home. He also argues that no evidence supported Carla's claim of endangerment to her mental or physical well-being because he purchased the firearm more than one year before Carla filed her emergency motion, he never threatened her with the firearm or abused her, and the parties had been cohabiting without significant incident for over two years during the pendency of the case. Jesse asserts that his lawful ownership of a firearm without allegations of misuse cannot alone justify the remedy of exclusive possession of the home. Further, he argues, for the first time on appeal, that his eviction from the marital residence was not the least restrictive means of resolving Carla's alleged concern because a simple resolution in this matter would have been the removal of the firearm from the home for

the remainder of the proceedings.[2] He also argues that the order granting Carla exclusive possession further harmed him and the marital estate because he must incur additional costs and expenses to maintain a second residence until the court finalizes the division of assets and debts, and the court's ruling serves to dwindle the marital estate at his expense.

¶ 34 We review orders granting exclusive possession of the marital residence pursuant to section 501(c-2) of the Act under a manifest weight of the evidence standard. See *In re Marriage of Levinson*, 2012 IL App (1st) 112567, ¶ 33. "A judgment is against the manifest weight of the evidence only when the opposite conclusion is clearly apparent." *In re Parentage of J.W.*, 2013 IL 114817, ¶ 55. As stated above, the trial court's authority to grant an order of exclusive possession of the marital residence is derived from the provisions of section 501(c-2) of the Act upon a showing that the physical or mental well-being of either spouse or their children is jeopardized by the occupancy of the marital residence by both spouses until the final determination of the cause. 750 ILCS 5/501(c-2). Additionally, the entry of any order under this provision does not in any manner affect any estate in homestead property of either party, and the court shall balance the hardships to the parties in granting exclusive possession of the residence. *Id.* "[R]esolution of a request for exclusive possession under section [501(c-2)] depends upon the particular factual circumstances of each case." *In re Marriage of Engst*, 2014 IL App (4th) 131078, ¶ 29.

¶ 35 Here, substantial evidence was presented demonstrating that Carla's mental well-being and that of the parties' daughter was at risk due to the stressful and contentious home environment, which was exacerbated by Jesse's purchase of a firearm post-filing, his carrying it with him in its

---

[2]"Generally, arguments not raised before the circuit court are forfeited and cannot be raised for the first time on appeal." *Mabry v. Boler*, 2012 IL App (1st) 111464, ¶ 15.

case, and his laying the firearm by his bed each night. The court considered Carla's testimony regarding the tension in the home for the past two years and that she feared for her safety, felt like a "sitting duck," locked her bedroom door every night, and was not functioning at "100%" at work. The court found that Carla had valid concerns about her daughter's mental well-being and considered the ongoing impact of the delayed proceedings on Carla's mental well-being. "[A] situation need not rise to the level of physical violence before [the remedy of exclusive possession] may be granted." *In re Marriage of Engst*, 2014 IL App (4th) 131078, ¶ 28. "A lack of physical violence or abuse between the parties does not warrant reversal of the trial court's decision [to grant exclusive possession] where the evidence otherwise shows a spouse or child's mental well-being was being adversely affected." *Id.* ¶ 34.

¶ 36     Contrary to Jesse's argument on appeal, the trial court conducted a thorough evaluation of the hardships faced by both parties and concluded that Jesse was well able to support himself if he moved into an apartment temporarily until he could find and purchase a home. In balancing the hardships, the court considered the parties' financial circumstances. Jesse, with an annual income of $150,000 and a recent loan of $50,000, had sufficient resources to secure alternative housing. Carla's willingness to assume all household expenses, thus freeing up $4,500 per month for Jesse, further supported the decision. Carla's higher income of approximately $250,000 underscored her ability to manage the marital residence independently.

¶ 37     Jesse, who worked remotely from the marital home, argues that relocation would cause financial inconvenience. However, the court balanced that against the immediate threat to the safety and mental health of Carla. Jesse's stable employment and the 48-day notice period until December 31, 2024, for vacating the home mitigated any abrupt financial impacts.

¶ 38    Jesse argues that the grant of exclusive possession of the marital home to Carla disrupts the status quo. He cites case law that warns the court against unnecessarily delineating property rights in a dissolution matter before the entry of a judgment for dissolution resolving all matters of the marital estate. However, the trial court's award of exclusive possession of the marital residence under section 501(c-2) does not delineate property rights as suggested by Jesse. The statute clearly provides that such an order of possession is effective until the final determination of the cause. Additionally, an order entered under 501(c-2) does not affect any estate in homestead property of either party.

¶ 39    The trial court also considered Carla's explanation regarding why she waited more than one year after Jesse purchased the firearm to file her emergency motion. Namely, Carla explained that she thought this contentious matter would conclude at the November 2024 trial, but then that trial date was continued to March 2025. She explained that she could not bear the mentally and emotionally stressful home environment for several more months.

¶ 40    The trial court's decision was based on evidence demonstrating the deteriorating mental well-being of Carla due to a stressful and contentious home environment, coupled with Jesse's acts of acquiring a firearm and placing it by his bed each night. The evidence also showed that Carla had valid and substantial concerns for her daughter's mental well-being. Furthermore, the trial court carefully balanced the financial hardships and granted Jesse a 48-day grace period to vacate the home.

¶ 41    Based on the above, we conclude that the trial court's decision to enter a bifurcated dissolution judgment that granted exclusive possession of the marital residence to Carla was not against the manifest weight of the evidence.

¶ 42                                    C. Bifurcated Proceeding

¶ 43    Jesse argues that the trial court abused its discretion in bifurcating the proceedings because bifurcation resulted in additional litigation and costs to him, prevented him from having access to the funds necessary to establish new housing away from the marital residence, and was unnecessary since the parties had agreed to move the November 2024 trial date to March 2025. Jesse states that courts have cautioned against the overuse of bifurcation to prevent prolonged litigation and unresolved disputes (*In re Marriage of Mathis*, 2012 IL 113496, ¶ 31), and bifurcation is not a means to push a case along to appease a client seeking to end the marriage (*In re Marriage of Awan*, 388 Ill. App. 3d 204, 218 (2009)).

¶ 44    We review a decision to bifurcate proceedings for an abuse of discretion. See *In re Marriage of Cohn*, 93 Ill. 2d 190, 201 (1982). An abuse of discretion will be found only where no reasonable person would take the view adopted by the trial court. *In re Marriage of Schneider,* 214 Ill. 2d 152, 173 (2005). Although the personal circumstances of the parties in some cases necessitate bifurcated proceedings, "the systematic interests in achieving finality, promoting judicial economy, and avoiding piecemeal litigation will typically militate in favor of resolving all ancillary issues before entering a judgment of dissolution." *In re Marriage of Mathis*, 2012 IL 113496, ¶ 31.

¶ 45    The trial court did not err in bifurcating the dissolution of marriage proceedings after the parties had agreed to reset the trial date. This decision was rooted in the statutory framework, relevant case law, and specific circumstances of the case. The trial court's authority to bifurcate proceedings in a dissolution of marriage case is derived from section 401(b) of the Act (750 ILCS 5/401(b) (West 2022)). This provision allows the court to enter a judgment of dissolution while

reserving other issues, such as property division and financial matters, for later determination if the circumstances warrant such action. Specifically, this section states that "[t]he court shall enter a judgment for dissolution that reserves any of these issues either upon (i) agreement of the parties, or (ii) motion of either party and a finding by the court that appropriate circumstances exist." Illinois caselaw establishes that bifurcation is permissible when immediate action is necessary to address urgent concerns. See *In re Marriage of Engst*, 2014 IL App (4th) 131078, ¶¶ 24, 34; *In re Marriage of Levinson*, 2012 IL App (1st) 112567, ¶ 34; *In re Marriage of Blount*, 197 Ill. App. 3d 816, 820 (1990).

¶ 46    Here, Carla moved the court for a bifurcated judgment of dissolution of marriage and other relief on November 13, 2024, the day the trial was rescheduled from November 13 and 14, 2024, to March 18, 19, and 20, 2025. Her verified petition and affidavit highlighted her fears concerning the escalated risk to her safety necessitating prompt judicial action to dissolve the marriage. Illinois courts have acknowledged that bifurcation can be an appropriate remedy under pressing circumstances. The court in *In re Marriage of Mathis*, cautioned against the overuse of bifurcation but recognized its necessity in protecting the interests of involved parties during protracted litigation. 2012 IL 113496, ¶ 31. Similarly, the court in *In re Marriage of Blount*, found that bifurcation was proper when the court needed to address urgent matters promptly to ensure the safety and well-being of the parties involved. 197 Ill. App. 3d at 820 (emotional status of an elderly, very ill woman was correctly determined to be an appropriate circumstance for bifurcating a judgment because the evidence "did not establish a financial entanglement which necessitated a delay in the judgment dissolving the marriage.").

¶ 47    Just as in *Mathis* and *Blount*, the trial court's discretion in bifurcating the proceedings here is supported by the threat to the mental well-being of Carla and the parties' daughter, which outweighed the potential complexities of delayed financial determinations. Although the parties agreed to reset the trial date to address outstanding discovery issues, subsequent developments also underscored the urgency for bifurcation. The rescheduled trial dates significantly extended the duration of the proceedings, leaving Carla in an unbearable situation for several additional months. By bifurcating the proceedings, the trial court appropriately responded to the threat to Carla's well-being, ensuring immediate relief while reserving other issues for later determination.

¶ 48    We conclude that the trial court did not abuse its discretion when it bifurcated the proceedings.

¶ 49                                        III. CONCLUSION

¶ 50    For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 51    Affirmed.